# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
_____

**BRANDON WINZER**,
      **Plaintiff,**

v.                                                                                  Case No. 17-C-1697

**MARY SAUVEY,** *et al.,*
      **Defendants.**
_____

## DECISION AND ORDER

Plaintiff Brandon Winzer, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. I allowed him to proceed on a deliberate-indifference claim against the defendants based on his allegations that, over the course of eight years, they failed to address his complaints of stomach pain, which were caused by a stomach tumor. The defendants filed a motion for summary judgment, which I address in this order.[1]

### I. BACKGROUND[2]

The plaintiff is an inmate at Oshkosh Correctional Institution. Docket No. 19 at ¶ 1. Defendants Dr. Mary Sauvey and Dr. Philip Wheatley were physicians at Oshkosh. *Id.* at ¶ 2-3. According to the plaintiff, defendants Jon Litscher, James Greer, Dr. Ryan Holzmacher, and Mary Muse were all "policy makers" who were responsible for creating

---

[1] In my screening order, I allowed the plaintiff to proceed on a deliberate-indifference claim against a John Doe defendant. The plaintiff never identified the Doe; therefore, I will dismiss the Doe based on the plaintiff's failure to diligently pursue his claim against him.

[2] The facts are taken from "Plaintiff's Response to Defendants' Proposed Findings of Fact" (Docket No. 25), and Defendants' Response to Plaintiff's Proposed Findings of Fact" (Docket No. 28). The facts are undisputed unless otherwise indicated.

policies that support the administration of adequate medical treatment to prisoners. Docket No. 1 at 15; Docket No. 28 at ¶¶ 13-16, 24.

The plaintiff was transferred to Oshkosh on March 17, 2012. Docket No. 25 at ¶ 14. Shortly after his transfer, Dr. Sauvey performed a chart review limited to the plaintiff's complaints of stomach pain. *Id.* at ¶ 17. She noted that, despite chronic, non-localized pain, the plaintiff's weight was stable. *Id.* From this, she concluded that his pain was unlikely to be caused by a malignancy. *Id.* She also reviewed the radiologist's report on an x-ray that had been taken a couple days before his transfer. *Id.* at ¶ 18. The x-ray showed no masses, calcification, or obstruction, leading the radiologist to conclude that the results were unremarkable. *Id.* Based on her review of the records, Dr. Sauvey ordered an ultrasound to determine the source of the plaintiff's pain. *Id.* at ¶ 19.

The ultrasound occurred on April 23, 2012; Dr. Sauvey reviewed the report about a week later. *Id.* at ¶ 20. The report indicated that the ultrasound was normal. *Id.* Given the normal x-ray and ultrasound reports, the plaintiff's history of intermittent pain, the absence of weight loss, and prior normal exams, Dr. Sauvey concluded that the plaintiff's medical condition was not urgent. *Id.*

The plaintiff was examined by a nurse on June 7, 2012. *Id.* at ¶ 22. Dr. Sauvey examined the plaintiff for the first time on August 10, 2012. *Id.* Dr. Sauvey explains that she is not responsible for scheduling patients; scheduling is done by the Health Services staff. *Id.* at ¶ 21. Dr. Sauvey never refused to see or treat the plaintiff. *Id.* After hearing the plaintiff's complaints, she treated him for a possible kidney stone. *Id.* at ¶ 22. She noted that, while he complained of a lot of pain, his weight was unchanged, his chest was clear, and his stomach was minimally tender. *Id.* at ¶ 23. She again concluded that his

condition was not urgent. *Id.* At this time, her working diagnoses included kidney stones or inflammation of the appendix. *Id.* at ¶ 24. Accordingly, she ordered a test that could detect blood in the plaintiff's stool (which can occur with an inflamed appendix) and an ultrasound to image his urinary system, colon, and appendix. *Id.*

The ultrasound occurred a couple of weeks later, and she reviewed the report the next day. *Id.* at ¶ 25. The report was unremarkable. *Id.* A couple of weeks after the ultrasound, on September 7, 2012, Dr. Sauvey saw the plaintiff again. *Id.* at ¶ 26. Following her examination, she diagnosed kidney stones or chronic appendicitis. *Id.* at ¶ 28. That same day, she submitted a request for a CT scan (which is performed off-site) of the plaintiff's stomach. *Id.* at ¶ 29.

Dr. Sauvey met with the plaintiff a week later, on September 14, 2012. *Id.* at ¶ 31. She noted that the labs taken to date were normal and the plaintiff was not losing weight. *Id.* The results of a test taken the day before supported a diagnosis of appendicitis, but not kidney stones. *Id.* at ¶ 32. She made a plan to schedule the CT scan, which had been approved. *Id.* at ¶ 34. She also ordered he be provided pain medication. *Id.*

The CT scan occurred on October 11, 2012, at Mercy Medical Center. *Id.* at ¶ 35. The radiologist reported that the stomach and duodenum were negative, concluding, "No significant abnormality identified." *Id.* at ¶ 36. Dr. Sauvey did not have access to the CT scan images; all imaging is done off-site. *Id.* at ¶ 37. Dr. Sauvey explains that the images would not have been useful to her because she does not have the specialized training required to read and interpret CT scans. *Id.* Accordingly, she relied on the radiologist's report. *Id.* Dr. Sauvey asserts that she had no reason to doubt the radiologist's opinion that the CT images showed no significant abnormalities. *Id.* at ¶ 39.

Based on the radiologist's report, Dr. Sauvey ruled out kidney stones, abdominal masses, and his appendix as the source of his pain. *Id.* at ¶ 40. Dr. Sauvey was unable to give the plaintiff a diagnosis based on the test results, which were unremarkable, but she did prescribe medication for his pain. *Id.*

Over the next several months, the plaintiff continued to complain of pain, and Dr. Sauvey continued to order tests. *Id.* at ¶ 41. She next saw him in March 2013. *Id.* at ¶ 42. She reviewed all of his previous tests and imaging, noting that they were all normal and provided no clues about the source of his pain. *Id.* She decided to draw a celiac panel and request approval for a colonoscopy. *Id.* at ¶ 44. The colonoscopy was approved on March 19, 2013, the same day Dr. Sauvey requested it. *Id.* at ¶ 45. The colonoscopy occurred about a month later. *Id.* at ¶ 47. The results revealed a polyp, which was later determined to be benign, and therefore not the source of the plaintiff's pain. *Id.* at ¶ 48.

Dr. Sauvey met with the plaintiff on June 11, 2013, to discuss the results of the colonoscopy. *Id.* at ¶ 49. The plaintiff reported that the pain was better. *Id.* She made a plan to recheck and proceed from there. *Id.* This was the last involvement Dr. Sauvey had in the plaintiff's care; she began to work at Green Bay Correctional Institution in October 2013, and she did not interact with the plaintiff again. *Id.* at ¶ 50. During the fifteen months she treated the plaintiff, she interacted with the plaintiff's case twenty times, including seeing him and ordering/reviewing test results. *Id.* at ¶ 55.

Dr. Wheatly first examined the plaintiff for complaints of stomach pain and cramping on November 10, 2014.[3] *Id.* at ¶ 56. He noted the plaintiff's long history of pain

---

[3] I allowed the plaintiff to proceed on a claim against Dr. Dawn Atkinson, who was a contract employee employed by Maxim Healthcare Services. *See* Docket No. 10. She apparently treated the plaintiff after Dr. Sauvey left Oshkosh, although the extent of her

4

complaints and numerous tests that were all negative. *Id*. The plaintiff told Dr. Wheatley that his prescription of Dicyclomine, which a nurse practitioner had prescribed for possible irritable bowel syndrome (IBS), provided only about an hour of relief. *Id.* Dr. Wheatley assessed the plaintiff with probable IBS. *Id.* at ¶ 57. He increased the plaintiff's Dicyclomine prescription; however, because the plaintiff was already experiencing some negative side effects, he made a note to consider a trial of Linzess if his IBS did not improve. *Id.* at ¶ 58. Linzess is a newer medication that is used to treat IBS with chronic constipation. *Id.* Dr. Wheatley also ordered stool and blood tests and set a follow-up appointment for one month later. *Id.* at ¶ 59.

Dr. Wheatley next saw the plaintiff on December 15, 2014. *Id.* at ¶ 60. The plaintiff said he experienced minor side effects with the medication, but his bowel movements were regular. *Id.* Dr. Wheatley maintained his probable IBS diagnosis, but he noted that a negative result on one of the tests he had ordered decreased the possibility of IBS being the cause of the plaintiff's stomach pain. *Id.* Dr. Wheatley decided to check the urinalysis and follow up in six weeks. *Id.*

On January 26, 2015, Dr. Wheatley again saw the plaintiff. The plaintiff was still experiencing stomach cramps; however, his suspected IBS was stable, so Dr. Wheatley

---

involvement is unclear. *See* Docket No. 28 at ¶¶ 12, 28. The Wisconsin Department of Justice declined to accept service on her behalf because she was not a Department of Corrections employee. Docket No. 10. She was not served with the plaintiff's complaint. I will dismiss her as a defendant for two reasons. First, the plaintiff did not diligently pursue his claims against her. Second, the plaintiff's only allegation against her is that she diagnosed the plaintiff with irritable bowel syndrome in May 2014. Docket No. 28 at ¶ 28. Accordingly, her treatment of the plaintiff appears to have been very limited, and, because the undisputed evidence shows that the 2012 CT scan report did not mention the tumor, the plaintiff's claim against her would fail for the same reasons his claims against Drs. Sauvey and Wheatley fail.

maintained the Dicyclomine prescription. *Id.* at ¶ 61. Dr. Wheatley next saw the plaintiff on March 10, 2015. *Id.* at ¶ 62. It did not appear that the plaintiff's condition had changed, so Dr. Wheatley maintained his diagnosis of probable IBS. *Id.* He also made a plan to order an ultrasound, take a blood test, and follow up in one to two weeks after the blood test. *Id.*

The ultrasound of the plaintiff's upper abdomen was done on March 23, 2015. *Id.* at ¶ 63. The scan showed a small cyst on the plaintiff's liver, which was of no clinical significance; the scan was unremarkable otherwise. *Id.* No tumor was seen in the area. *Id.* About a week later, after the plaintiff continued to complain of pain, Dr. Wheatley made a plan to check his Hgb to evaluate for anemia. *Id.* at ¶ 64.

Dr. Wheatley next met with the plaintiff on July 4, 2015. *Id.* at ¶ 65. He noted that the plaintiff's symptoms seemed to be worsening: The medication was not helping, the pain was often random, he was occasionally constipated, and he occasionally had diarrhea. *Id.* Dr. Wheatley considered the possibility of Crohn's Disease, which can cause abdominal pain. *Id.* at ¶ 67. He submitted a request for an upper GI x-ray, which was approved. *Id.* at ¶ 68.

The x-ray was completed on August 4, 2015. *Id.* at ¶ 69. The x-ray evaluated the lining of the stomach, which (unknown at that time) is where the plaintiff's tumor was located; however, the report stated that "no mass or ulceration" was seen in the stomach. *Id.* The plaintiff asserts that this report was edited by Dr. Wheatley, although he does not explain why he believes Dr. Wheatley is the one who edited it, nor does he explain in what way the report was edited. *Id.* Dr. Wheatley explains that he received only the report of the x-ray reading, not the actual x-ray. *Id.* at ¶ 70. He explains that, had the report

6

mentioned an abnormality in the stomach, he would have pursued additional evaluation; however, the report was of a normal stomach with no masses, so he did not recommend further testing. *Id.*

Dr. Wheatley met with the plaintiff on September 4, 2015, and again on December 22, 2015. *Id.* at ¶¶ 71-72. The plaintiff continued to complain of stomach cramping on his right side. *Id.* Dr. Wheatley continued to maintain his diagnosis of probable IBS. *Id.* at ¶ 72. He ordered blood tests and requested a two-month trial of the medication Linzess, which was approved on January 4, 2016. *Id.* at ¶ 73. Dr. Wheatley discontinued the medication on March 21, 2016, because the plaintiff complained that it was giving him diarrhea. *Id.* at ¶ 74.

In early May 2016, Dr. Wheatley ran labs to test the plaintiff's stool for blood, and in late May, Dr. Wheatley noted that test results suggested that the plaintiff may have an allergy to soy. *Id.* at ¶ 76. Dr. Wheatley placed the plaintiff on a no-soy diet for two months to see if that would improve his stomach pain. *Id.*

In July 2016, Dr. Wheatley again met with the plaintiff, who reported limited improvement. *Id.* at ¶ 77. The plaintiff explained that the pain had decreased but the cramps and gas had not. *Id.* The plaintiff had been on the no-soy diet for about a month; Dr. Wheatley decided to continue with the diet and to order more labs. *Id.* During an assessment in October 2016, the plaintiff reported he had increased gas and loose stool. *Id.* at ¶ 78. Dr. Wheatley prescribed Imodium. *Id.*

In January 2017, the plaintiff complained that he was still in pain; he also said his urine was dark and his groin hurt. *Id.* at ¶ 79. Dr. Wheatley ordered a urinalysis and told the plaintiff that, if the pain persisted, he would consider another CT scan of the pelvis to

7

evaluate his liver and kidneys. *Id.* He continued to consider a possible soy allergy, extending the plaintiff's no-soy diet. *Id.*

In April 2017, Dr. Wheatley tried a new medication to address the plaintiff's complaints of cramping in case IBS was still a component of the plaintiff's stomach pain. *Id.* at ¶ 80. Dr. Wheatley met with the plaintiff at the end of May. *Id.* at ¶ 81. The plaintiff reported that the medication had decreased his pain a little, so Dr. Wheatley continued the prescription. *Id.* In July, the plaintiff reported that he still had occasional stomach discomfort. *Id.* at ¶ 82. Dr. Wheatley continued the low-soy diet for a year, ordered blood tests, and made a plan to follow up a week or two after the results came in. *Id.*

About a month later, on August 9, 2017, the plaintiff saw Dr. Murphy on a sick call, which was scheduled after the plaintiff complained of chronic stomach pain, dark stool, and dark material in his vomit. *Id.* at ¶ 83. The plaintiff explains that he passed out and had to be lowered to the floor. *Id.*; Docket No. 28 at ¶ 5. Dr. Murphy assessed a possible GI bleed and sent the plaintiff to the emergency room at Mercy Medical, where a CT scan was performed. Docket No. 25 at ¶¶ 83-84. The scan showed a large mass in the plaintiff's stomach wall. *Id.* at ¶ 85. The report noted that the mass had not changed much since 2012; it acknowledged that the mass had not been reported in 2012. *Id.*; Docket No. 28 at ¶ 30. Mercy Medical determined the plaintiff had an upper GI bleed secondary to a tumor. Docket No. 25 at ¶ 86. The plaintiff was transferred to the University Hospital and Clinic for further treatment. *Id.*

A few days later, on August 13, 2017, an endoscopy and biopsy were performed. *Id.* at ¶ 87. The biopsy showed that the tumor was more consistent with a benign tumor than a malignant tumor. *Id.* The University Hospital and Clinic treated the ulcer bed over

8

the tumor with stapling and treated the tumor with embolization. *Id.* at ¶ 89. A doctor from the University Hospital and Clinic recommended a resection of the tumor to prevent further growth or bleeding. *Id.* at ¶ 90.

The plaintiff returned to Oshkosh on August 18, 2017, and he met with Dr. Wheatly on August 21, 2017. *Id.* at ¶ 88. Dr. Wheatley noted that, although the tumor was visible on the 2012 CT scan, it had not been mentioned in the report. It also was not in the 2015 x-ray report that Dr. Wheatley had reviewed. *Id.* at ¶ 89.

A couple of days after receiving the recommendation for a resection, Dr. Wheatley submitted a request for a partial gastric resection of the tumor. *Id.* at ¶ 91. He explained that the issue had been partially treated with vessel embolization, but a resection was needed soon. *Id.* The request was approved, and the resection, which resulted in the removal of about 25% of the plaintiff's stomach, was performed on September 29, 2017. *Id.* at ¶ 92; Docket No. 28 at ¶ 4. In December 2017, the plaintiff told Dr. Wheatley that his stomach no longer hurt. Docket No. 25 at ¶ 94; Docket No. 28 at ¶ 23.

## II. ANALYSIS

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). For the purposes of deciding defendants' motion, I resolve all factual disputes and make all reasonable factual inferences in favor of the plaintiff, who is the non-moving party. *Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008).

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prove a deliberate-indifference claim, a plaintiff must first show that he has "a medical condition 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Edwards v. Snyder*, 478 F.3d 827, 830-31(7th Cir. 2007) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). He must then show "that the prison official[s] knew of 'a substantial risk of harm to [him] and disregarded the risk.'" *Id.* at 831 (first quoting *Greeno*, 414 F.3d at 653; and then citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Defendants do not dispute that the plaintiff's chronic stomach pain was an objectively serious medical condition, so my analysis will focus only on whether the defendants were deliberately indifferent to the plaintiff's condition.

I understand that the plaintiff is frustrated that he had to endure eight years of pain before his condition was accurately diagnosed and treated. However, under the Eighth Amendment, "a mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2013). This is because "an *inadvertent* failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Id.* (citing *Estelle*, 429 U.S. at 105). To establish that a defendant was deliberately indifferent, a plaintiff must show that, despite knowing about a risk of serious harm to the plaintiff, the defendant ignored the risk, persisted in an ineffective course of treatment, or made treatment decisions that

10

radically departed from "from acceptable professional judgment, practice or standards." *Id.* (citations omitted). The plaintiff offers no such evidence.

The evidence shows that both Drs. Sauvey and Wheatley never stopped trying to identify the source of the plaintiff's pain. They ordered lab work, blood tests, and urinalysis, prescribed medications to address various symptoms, and adjusted the plaintiff's diet. They assert that, while they were treating the plaintiff, they never found any indication that a tumor was the source of the plaintiff's stomach pain. Both doctors ordered a number of tests, including a colonoscopy, x-rays, and CT scans. Because those tests were done offsite, neither of the doctors had access to the actual imaging and/or x-ray films. Their knowledge was limited to the information in the specialists' reports. Prior to 2017, all of the reports indicated the results were normal. Further, the plaintiff exhibited no warning signs of a tumor. His weight was stable, his blood count was normal, and there was no bleeding until 2017, at which time he was immediately sent to the hospital for further tests and treatment.

The plaintiff tries to contradict Drs. Sauvey's and Wheatley's assertions that there was no evidence of a tumor until 2017 with two arguments. He first points to the radiology report from the 2015 x-ray. Docket No. 20-1 at 356. The bottom of the report has the following notation: "Edited Date: 08/04/2015 by PROVIDER." *Id.* This notation does not give rise to a reasonable inference that either defendant edited the document to remove references to evidence of a tumor. The report does not indicate who "PROVIDER" is, nor does it explain how the report was edited. The plaintiff's assumption that Dr. Wheatley edited the report to remove references to a tumor is mere speculation. Speculation, conjecture, and assumptions are insufficient to withstand summary judgment, and they

11

are insufficient to create a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Next, the plaintiff contends that the radiologist from Mercy who interpreted the CT scans told him that he had informed Oshkosh Correctional Institution of the tumor in 2012. In his response to the defendants' proposed findings of fact, the plaintiff asserts that "when the tumor was found that same Dr. stated that it was the same tumor from 2012 that he told OSCI HSU about." (Resp. to Defs. PFOF ¶ 36.) He later asserts that "[t]he doctor from the hospital stat[ed] that he informed Oshkosh [of] the tumor in 2012." (*Id.* ¶ 96.) In support of these assertions, the plaintiff cites paragraph 86 of his verified complaint. However, the complaint does not support either assertion. It alleges:

> The doctor at Mercy medical center told plaintiff that this was the same tumor from 2012 and nothing had been done about it. Either mercy medical center failed to inform OSCI medical staff or OSCI medical staff failed to adhere to the treating doctors recommendations. After a complete discovery plaintiff may ask for leave of the court to file an amended complaint.

(Compl. ¶ 86.) This paragraph does not allege that, in 2012, the radiologist told Oshkosh Correctional Institution that the CT scan revealed a tumor. Instead, it alleges that *either* the hospital failed to inform the correctional institution about the tumor *or* the correctional institution failed to act on the information, and that the plaintiff would try to identify what actually happened during discovery. According to the defendants' evidence, the hospital did not inform the correctional institution about the tumor. The plaintiff apparently was unable to find any contrary evidence during discovery. Thus, the only reasonable

12

inference is that the hospital did not inform the correctional institution that the CT scan revealed a tumor.[4]

In short, no reasonable jury could conclude from the evidence that Drs. Sauvey or Wheatley were deliberately indifferent to the plaintiff's serious medical condition. Accordingly, they are entitled to summary judgment.

The plaintiff is also proceeding on a claim that Litscher, Greer, Holzmacher, and Muse created a policy that resulted in a delay in the treatment of his tumor. The defendants are entitled to summary judgment on this claim. The undisputed evidence shows that the delay in treating the plaintiff's tumor was a result of his doctors not knowing about the tumor until 2017; the delay was not the result of any policy. Every treatment request made by the plaintiff's doctors was promptly granted, including the request for surgery once the tumor was identified. Based on the evidence, no jury could reasonably conclude that the plaintiff was injured by any institution policy.

## ORDER

**THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (Docket No. 17) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants John Doe and Dawn Atkinson are **DISMISSED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The clerk's office shall enter judgment accordingly.

---

[4] I also note that the plaintiff's statements about what the radiologist told him are inadmissible hearsay. For the radiologist's statements to be admissible, the plaintiff would have to submit an affidavit or other evidence from the radiologist.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 15th day of December, 2018.

                                            s/Lynn Adelman
                                            LYNN ADELMAN
                                            United States District Judge